UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SOUND ACTION, et al. | CASE NO. C18-0733JLR |
| Plaintiffs, | ORDER DENYING DEFENDANT'S MOTION TO DISMISS |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | |
| Defendant. | |

## I. INTRODUCTION

Before the court is Defendant United States Army Corps of Engineers' ("the Corps") motion to dismiss count one of Plaintiffs Sound Action, Friends of the San Juans, and Washington Environmental Council's (collectively, "Plaintiffs") complaint. (Mot. (Dkt. # 13); *see also* Compl. (Dkt. # 1).) Plaintiffs oppose the motion. (Resp. (Dkt. # 17).) The Corps filed a reply. (Reply (Dkt. # 20).) The court has considered the motion, the parties' submissions concerning the motion, the relevant portions of the

record, and the applicable law.  Being fully advised,[1] the court DENIES the Corps'
motion.

## II.    BACKGROUND

Plaintiffs' lawsuit challenges the Corps' implementation of the Clean Water Act
("CWA"), 33 U.S.C. § 1251 *et seq.*  (*See generally* Compl.)  Specifically, Plaintiffs
allege that the Corps uses an improper datum to determine the high tide line in the Puget
Sound's tidal waters, causing the Corps to unlawfully limit its jurisdiction under the
CWA.  (*See generally id.*)  Consequently, according to Plaintiffs, the Corps is
underperforming its CWA oversight duties, thus exposing the Puget Sound shoreline to
the harmful effects of shoreline armoring.  (*Id.* ¶ 1.)

**A.    The Clean Water Act**

Section 404 of the CWA prohibits the discharge of dredged or fill materials into
navigable waters without a permit.  (*Id.* ¶ 13 (citing 33 U.S.C. § 1344).)  "The
construction of seawalls, bulkheads, and similar structures for shoreline armoring within
navigable waters constitutes a discharge of dredged or fill materials under the CWA."
(*Id.* ¶ 15 (citing 33 C.F.R. § 323.2).)  Plaintiffs allege, and the Corps does not dispute,
that a shoreline armoring project in a navigable water requires a § 404 permit.  (*Id.*; *see
generally* Mot.)

//

---

[1] The parties request oral argument on the motion (*see* Mot. at 1; Resp. at 1), but the court
concludes that oral argument would not be helpful to its disposition of the motion, *see* Local
Rules W.D. Wash. LCR 7(b)(4).

The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362.  As it relates to tidal waters, such as those Puget Sound tidal waters at issue in this litigation, "waters of the United States" is defined to mean waters up to the "high tide line."  (Compl. ¶ 16 (citing 33 C.F.R. § 328.4(b).)  Thus, a shoreline armoring project in tidal waters requires a § 404 permit if it is located below the high tide line.  (*Id.*)

The Corps currently defines the "high tide line" as:

> [T]he line of intersection of the land with the water's surface at the maximum height reached by a rising tide.  The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide.  The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm.

51 Fed. Reg. 41,206, 41,251 (Nov. 13, 1986) (originally codified at 33 C.F.R. § 328.3(d); codified at 33 C.F.R. § 328.3(c)(7) in 2015).  The parties do not dispute that this is the current definition of high tide line.  (*See* Compl. ¶ 20; Mot. at 9-10.)  At the heart of this case is how to determine the high tide line.

**B.      2015 Clean Water Rule**

In June 2015, the Environmental Protection Agency ("EPA") passed the Clean Water Rule ("the 2015 Rule").  (Compl. ¶ 21 (citing 80 Fed. Reg. 37,054 (June 29, 2015)).)  The 2015 Rule revised parts of the CWA's "waters of the United States" definition, although it left the "high tide line" definition unchanged.  (*Id.*); *compare* 51

Fed. Reg. at 41,251, *with* 80 Fed. Reg. at 37,106.  Numerous parties have challenged the 2015 Rule in court, leading to preliminary injunctions in 28 states, not including Washington State.  (Compl. ¶ 21; *see also* Mot. at 11.)

On February 28, 2017, President Donald Trump issued Executive Order 13778, directing the EPA and the Army to review and revise the "waters of the United States" definition.  (*See* Compl. ¶ 21); *see also* 82 Fed. Reg. 12497 (Feb. 28, 2017).  In light of Executive Order 13778, the EPA issued a rule in February 2018 that delayed implementing the 2015 Rule until February 2020 ("the Applicability Rule").  (Compl. ¶ 21 (citing 83 Fed. Reg. 5,200 (Feb. 6, 2018)).)  The Applicability Rule instructs agencies to follow the pre-2015 Rule CWA regulatory definitions, including the definition of "high tide line."  (*Id.*)  The Applicability Rule is currently enjoined in Washington State.  (*See* Mot. at 12 (citing cases).)  As stated, the pre- and post-2015 Rule definition of "high tide line" is identical.

## C.    Shoreline Armoring

Shoreline armoring involves the construction of seawalls, bulkheads, and similar structures in order to, *inter alia*, stabilize the shoreline.  (*Id.* ¶¶ 15, 33.) According to Plaintiffs, more than a quarter of Puget Sound's shorelines are already armored.  (*Id.* ¶ 28.)  On average, between 2011 and 2015, 3,483 feet of new shoreline armoring was added annually.  (*Id.*)  Plaintiffs allege that shoreline armoring damages the Puget Sound ecosystem by disrupting species' spawning habitat and eliminating vegetation and finer-grained sediments.  (*Id.* ¶¶ 29, 31-33.)  These impacts are felt throughout the food chain, affecting forage fish and aquatic plants as well as endangered salmon and orcas.

(*Id.* ¶ 31, 34.)  Plaintiffs assert that shoreline armoring is one of the main impediments to restoring the Puget Sound habitat.  (*Id.* ¶ 30.)

**D.    High Tide Line**

The Seattle District of the Corps ("the Seattle District") oversees CWA § 404 permits in the Puget Sound region on behalf of the Corps.  (*Id.* ¶ 35.)  Projects in the Puget Sound that are below the high tide line are within the Seattle District's jurisdiction.  (*Id.* (citing 33 C.F.R. § 328.3(c)(7)).)

The Seattle District uses the mean higher high water ("MHHW") datum to determine the high tide line and, consequently, the limit of its § 404 jurisdiction in tidal waters.  (*Id.* ¶ 36.)  According to Plaintiffs, MHHW "is unequivocally significantly lower than the maximum height reached by a rising tide" and "is surpassed between three to five times a week in Washington state."  (*Id.* ¶¶ 36-37.)  In other words, "about a quarter of high tides" in the Seattle District's region are above MHHW.  (*Id.* ¶ 37.)  Plaintiffs allege that the Seattle District began using MHHW in the 1970s "when the CWA was initially passed because that was the highest tidal elevation data available at the time."  (*Id.* ¶ 39.)  Now, however, there is data for higher tidal elevations.  (*Id.*)  Plaintiffs point out that other Corps districts on the West Coast use different datums to determine the high tide line.  (*Id.* ¶ 38.)

Plaintiffs compare MHHW against two datums that the National Oceanic and Atmospheric Administration ("NOAA") collects:  highest astronomical tide ("HAT") and mean annual highest tide ("MAHT").  (*Id.* ¶¶ 40-42.)  HAT is "the highest predicted periodic astronomical tide occurring every 19 years."  (*Id.* ¶ 40.)  MAHT is "the average

of the highest annual tide predicted over a period of 19 years." (*Id.*)  According to

Plaintiffs, the difference between MHHW and HAT on a shoreline in Puget Sound varies

by location, ranging from 15 to 32 vertical inches.  (*Id.* ¶ 41.)  The difference between

MHHW and MAHT ranges from 13 to 29 inches.  (*Id.*)  Plaintiffs claim that "the area

between [MHHW] and [MAHT] represents up to 8,600 acres of shoreline area in

Washington state." (*Id.*)  Plaintiffs allege that, because MHHW is below the true high

tide line, "the majority of shoreline armoring projects in the Puget Sound region do not

fall within the Seattle District's unlawfully narrow definition of its tidal jurisdiction."

(*Id.* ¶ 42.)  In other words, Plaintiffs argue that numerous shoreline armoring projects in

the Seattle District escape required § 404 permitting oversight.  (*Id.* ¶¶ 42-43.)  Multiple

entities have asked the Seattle District to use a higher jurisdictional boundary for its

§ 404 permitting, including the National Marine Fisheries Service, the Northwest Indian

Fisheries Commission, and Washington State.  (*Id.* ¶¶ 44-47.)

**E.    Interagency Workgroup**

    In January 2016, the Seattle District, EPA Region 10, and the West Coast Region

of NOAA formed an interagency workgroup to address the Seattle District's high tide

line datum.  (*Id.* ¶ 48; *see also* Mot. at 13, Ex. 2 ("Workgroup Report") at 7.)  In

November 2016, the workgroup completed a draft report.  (Compl. ¶ 48.)  As explained

in the report, the workgroup recognized that HAT "would extend CWA review process to

the uppermost reaches of the intertidal zone." (*Id.*; Workgroup Report at 30.)

Nonetheless, the workgroup recommended to the Corps' Northwestern Division (which

//

oversees the Seattle District) that the Seattle District use MAHT as its high tide line datum.  (Compl. ¶ 48; Workgroup Report at 3.)  The workgroup explained:

> MAHT[] is an elevation that is reasonably representative of the intersection of the land and the water's surface at the maximum height reached by the rising tide, is based on gravitational forces, is predictable, reliable, repeatable, reasonably periodic, measurable, simple to determine, scientifically defensible, and based on data that is reasonably available and accessible to the public.

(*Id.*)

## F.     Major General Spellmon Memorandum

On January 19, 2018, Major General Scott Spellmon, then the Commander of the Corps' Northwestern Division, wrote a memorandum to the Seattle District regarding the ongoing high tide line evaluation ("Spellmon Memo").  (Compl. ¶ 50; Mot. at 14, Ex. 1 ("Spellmon Mem.").)  Major General Spellmon said that he had reviewed the workgroup's recommendation to use MAHT.  (Spellmon Mem. at 1.)  But, he explained, in light of the EPA and Army's efforts to review and revise the "waters of the United States" definition as directed by Executive Order 13778, the Corps' "current focus must shift to other initiatives," and that "[f]urther efforts to study, re-evaluate or reinterpret the [high tide line] definition would not be an organizationally consistent use of resources within the Corps."  (*Id.*)  Major General Spellmon further stated:  "I maintain that elevations such as MAHT as they would be applied in Puget Sound are not consistent with the intent of the current definition of [high tide line]."  (*Id.*)  He then "direct[ed]" the Seattle District "to shift away from further consideration of changing the Corps Clean Water Act jurisdiction limit in tidal waters."  (*Id.* at 2.)

**G.    The Corps' Motion to Dismiss**

On May 21, 2018, Plaintiffs brought this action against the Corps, alleging two causes of action.  (*See* Compl. ¶¶ 57-67.)  The Corps' motion to dismiss addresses only the first.  (*See generally* Mot.)  In their first claim, Plaintiffs allege that the Corps' decision to maintain an unlawful § 404 jurisdictional boundary, as reflected in the Spellmon Memo, is a violation of the CWA, reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551(13), 704, 706(2).  (*Id.* ¶¶ 57-63.)

The Corps moves to dismiss Plaintiffs' first claim for lack of subject matter jurisdiction.  (*See generally* Mot.)  In short, the Corps alleges that its decision to maintain MHHW as its high tide line marker is not a "final agency action" and therefore not reviewable under the APA.  (*Id.* at 3.)  The Corps also argues that, even if its decision to maintain MHHW was a reviewable final agency action, the court should dismiss count one because Plaintiffs lack standing.  (*Id.*)

### III.    ANALYSIS

**A.    Standard on a Motion to Dismiss**

The burden of establishing subject matter jurisdiction rests with the party asserting jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Here, Plaintiffs bear that burden.

A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) can be facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for*

*Everyone v. Meyer*, 373 F.3d 1035, 1309 (9th Cir. 2004). In contrast, "in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* When a party brings a factual attack, the court does not need to presume the truthfulness of a plaintiff's allegations. *White*, 227 F.3d at 1242.

The Corps did not specify in its motion whether it brings a facial or factual attack. (*See generally* Mot.) Plaintiffs argue in their response that the Corps brings a facial challenge because it "does not dispute Plaintiffs' factual allegations and instead challenges the finality of an agency action that itself is not in dispute." (Resp. at 7.) The Corps replies that it indeed brings a factual challenge because, "[r]ather than relying only on the pleadings . . . , the Corps attached the Spellmon Memo and [Workgroup Report] to its motion, and argued its motion based on these documents." (Reply at 3.)

In both factual and facial challenges, "the court may look beyond the face of the pleadings and consider 'exhibits attached to the complaint, matters subject to judicial notice, [and] documents necessarily relied on by the complaint and whose authenticity no party questions.'" *Jensen v. Ferguson*, C14-0740JLR, 2014 WL 4674158, at *2 (W.D. Wash. Sept. 17, 2014) (quoting *Bautista-Perez v. Holder*, 681 F. Supp. 2d 1083, 1087 (N.D. Cal. 2009) (citing *Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001))). In addition, consideration of this type of information does not convert the motion into one for summary judgment. *White*, 227 F.3d at 1242.

The court concludes that the Corps has brought a facial challenge to Plaintiffs' first cause of action. The Corps does not dispute the truth of Plaintiffs' allegations. *See Safe Air*, 373 F.3d at 1309; (*see generally* Mot.) For example, the Corps does not allege

that the Spellmon Memo does not exist or that its contents are not as Plaintiffs' portray. (*See* Mot. at 17-21.)  Instead, the Corps takes issue with Plaintiffs' understanding of the Spellmon Memo, asserting that Plaintiffs' claim is insufficient because the Spellmon Memo is not reviewable final agency action.  (*Id.*)  Likewise, the Corps does not contest Plaintiffs' factual allegations regarding standing; rather, it challenges whether Plaintiffs' allegations are sufficient to confer standing.  (*Id.* at 23-25.)  In short, whether subject matter jurisdiction or standing exists does not depend on resolution of a factual dispute, but instead on the allegations in Plaintiffs' complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  Therefore, the Corps has levied a facial challenge to the court's subject matter jurisdiction.  As such, the court assumes the allegations in Plaintiffs' complaint are true and draws all reasonable inferences in Plaintiffs' favor.  *Id.* (citations omitted).

The court will also consider the Spellmon Memo and Workgroup Report in analyzing the Corps' motion.  The Corps attached these documents to its motion (*see* Mot. at 13-14; Spellmon Mem.; Workgroup Report), count one of Plaintiffs' complaint "necessarily relies on" them, and no party questions the documents' authenticity, *Lee*, 250 F.3d at 688; (Compl. ¶¶ 57-63).  Consideration of these documents does not transform the Corps' motion into one for summary judgment.  *White*, 227 F.3d at 1242.

However, the court will not consider the exhibits that Plaintiffs filed with their opposition.  (*See* Resp. at 27-28, Exs. A-E.)  Exhibit A to Plaintiffs' opposition is a petition that relates solely to count two of their complaint, which is not at issue here. (*See* Resp. at 28, Ex. A at 2-16; Compl. ¶¶ 64-67.)  In other words, Plaintiffs' count one

does not "necessarily rel[y]" on this document.  *See Lee*, 250 F.3d at 688.  Exhibits B-E are declarations by members of Plaintiffs' nonprofit organizations, filed to demonstrate Plaintiffs' standing.  Plaintiffs recognize that the Corps' motion to dismiss "should be decided on the face of the complaint, and general factual allegations of injury should suffice for a motion to dismiss."  (Resp. at 27 n.5 (quotation omitted).)  But, Plaintiffs explain, they submitted the declarations to "fully respond to the pending motion."  (*Id.*) These declarations are improper extrinsic evidence at this stage.  They are not "exhibits attached to the complaint, matters subject to judicial notice, [or] documents necessarily relied on by the complaint and whose authenticity no party questions."  *Jensen*, 2014 WL 4674158, at *2.  And because the Corps has brought a facial, and not a factual, challenge, Plaintiffs do not need to furnish affidavits or other evidence in response.  *Cf. Savage v. Glendale Union High Sch., Dist. No. 205 Maricopa Cty.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003) ("Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.").  The court therefore does not consider Plaintiffs' opposition exhibits A-E in deciding the Corps' motion.

**B.    Final Agency Action**

The APA provides for judicial review of "final agency action."  5 U.S.C. § 704.  If there has been no "final agency action" within the meaning of the APA, then the action is not reviewable.  *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).  When analyzing whether an agency action is final, "[t]he core

question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 796-97 (1992). The Supreme Court has established a two-part test to determine if an agency action is "final." *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (citations omitted). The Corps argues that "the Spellmon Memo does not meet either prong of the finality test." (Mot. at 17.)

    1. <u>Consummation of the Agency's Decision-Making Process</u>

       The Corps asserts that the Spellmon Memo does not mark the consummation of its decision-making process for two main reasons. (*Id.* at 17-19.) First, the Corps argues that, "[r]ather than reaching any conclusions, the [Spellmon Memo] deferred consideration of the recommendation that the Seattle District adopt an alternative tidal datum metric at a time when the Corps and EPA" are reconsidering the 2015 Rule pursuant to Executive Order 13778. (*Id.* at 18.) According to the Corps, decisions to defer agency action do not mark the consummation of a decision-making process. (*Id.* at 18-19 (citing cases).) Second, the Corps asserts that the Spellmon Memo does not conclude the larger process of "improv[ing] shoreline habitat." (*Id.* at 19.) Instead, the Spellmon Memo "expressly embraces 'other initiatives that can improve protection of

//

important shoreline habitat,'" and directs the Seattle District to work on other ways to enhance the shoreline.  (*Id.* (citing Spellmon Mem. at 1).)

The Corps is correct that deferrals of agency action often do not qualify as final agency action.  *See, e.g.*, *Am. Petroleum Inst. v. U.S. EPA*, 216 F.3d 50, 68 (D.C. Cir. 2000) ("A decision by an agency to defer taking action is not a final action reviewable by the court.").  But the Spellmon Memo is not a deferral.  In determining whether an agency's action is final under the APA, courts look to a variety of factors, "including the agency's own characterization." *Am. Portland Cement All. v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996).  The Spellmon Memo does not state that it is "deferring" its decision on the high tide line or intimate as much.  (*See* Spellmon Mem.)  Likewise, the Spellmon Memo is not "an announcement of an agency's intent to establish law and policy in the future." *Am. Portland Cement All.*, 101 F.3d at 777.  To the contrary, the Spellmon Memo "direct[s]" the Seattle District to stop evaluating high tide line datum and "shift away from further consideration of changing the Corps [CWA] jurisdiction limit." (Spellmon Mem. at 1-2.)  By reiterating that the Seattle District will use MHHW as its high tide line datum, and by precluding future consideration of the issue, the Corps, "for all practical purposes, has ruled definitively" on the Seattle District's § 404 jurisdiction. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016) (citation and internal quotations omitted).  In short, the Spellmon Memo is not a deferral.

Even reading the Spellmon Memo to say that the Corps will reevaluate its high tide line after the CWA "waters of the United States" definition is revised—a liberal reading, to be sure—does not make the Corps' decision non-final.  "An agency action

may be final even if the agency's position is 'subject to change' in the future." *Nat'l Env. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000)). Indeed, "all laws are subject to change. . . . The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Appalachian Power*, 208 F.3d at 1022. Whether the EPA and Army revise the "waters of the United States" definition at some future date such that it impacts the Corps' high tide line jurisdiction is a potential issue for a later date—as are an infinite number of contingencies that do not undermine the present finality of the Corps' decision.

In much closer cases, courts have found that agency actions potentially subject to future revision mark the consummation of the decision-making process. For example, in *Clean Air Project*, the D.C. Circuit found that a permitting directive sent by the Director of the EPA to the EPA's regional offices marked the end of the agency's decision-making process even though the directive expressly stated that the EPA was still "assessing what additional actions may be necessary," and that "EPA's deliberations surrounding the matter are ongoing." 752 F.3d at 1006. Along with this qualifying language, the court considered that the directive "provides firm guidance to enforcement officials about how to handle permitting decisions," and that it "clearly reflect[ed] a settled agency position." *Id.* at 1007 (quotations omitted). The Spellmon Memo does not contain qualifying language on par with the *Clean Air Project* directive. But, like the directive in *Clean Air Project*, the Spellmon Memo "provides firm guidance" to the Seattle District about the

//

Corps' "settled agency position" to use MHHW to define the Seattle District's § 404 jurisdiction. *See id.*

In addition, similar to other agency actions that courts have considered to be a consummation of the decision-making process, the Corps' decision came after reviewing the report produced by a workgroup that included scientists, attorneys, and leaders from three agencies, and which was "convened" by the Seattle District. (*See* Workgroup Report at 7, 48 (listing "Principal Workgroup Members")). In other words, the Corps reached its decision after evaluating new information from a group of experts that the Corps assembled. This process supports a finding of final agency action. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 14 (D.C. Cir. 2005) ("The Protocols at issue in this case clearly marked the consummation of the decisionmaking process. The Protocols were published after the FWS solicited input from specialists and reviewed data from past field seasons."). The Corps alleges that its decision should not be considered final because the Workgroup Report "expressly states that it does not represent the views of the relevant agencies." (Mot. at 19.) But the finality of Workgroup Report is not the question before the court. The Spellmon Memo's conclusion that the Seattle District maintain MHHW and halt any future consideration of its high tide line datum reflects the consummation of the Corps' decision-making process regardless of the documents that the Corps relied upon to reach that conclusion.

Whether, as the Corps argues, the decision to stop evaluating the high tide line is simply a piece of the Corps' larger process of "improv[ing] shoreline habitat" does not undermine the finality of the Corps' decision. (Mot. at 19.) In fact, the Corps contradicts

itself on this point.  On the one hand, the Corps claims that Plaintiffs have improperly challenged only a discrete part of a larger programmatic initiative and that the decision to maintain the MHHW marker must be considered within this larger, unfinished effort to improve the shoreline.  (*See id.*)  On the other hand, the Corps claims that Plaintiffs have improperly challenged a "broad programmatic" policy rather than a particular final agency action, thus depriving the court of jurisdiction.  (*See id.* at 22 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990)).)  The court finds that Plaintiffs have properly challenged a specific agency action:  the Corps' decision to indefinitely maintain MHHW as the Seattle District's high tide line datum.  The Spellmon Memo marks the consummation of the Corps' decision-making process on this point.

      2.  <u>Determination of Rights and Obligations</u>

      The Corps also argues that the Spellmon Memo is not final agency action because it does not determine "rights or obligations" and no "legal consequences will flow" from it.  (*Id.* at 20-23 (citing *Bennett*, 520 U.S. at 178).)  The general rule is that agency actions are "not final and reviewable unless and until they impose an obligation, deny a right, or fix *some* legal relationship as a consummation of the administrative process."  *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 986-87 (9th Cir. 2006).  But "[t]he legal relationship need not alter the legal regime to which the involved federal agency is subject."  *Id.* at 987.  In other words, "*Bennett*'s second requirement can be met through different kinds of agency actions, not only one that alters an agency's legal regime."  *Id.*  In determining whether this requirement is met, courts consider whether the agency action "has the status of law or comparable legal force, and whether immediate

compliance with its terms is expected." *Ukiah Valley Med. Ctr. v. Fed. Trade Comm'n*, 911 F.2d 261, 264 (9th Cir. 1990). Courts "focus on both the practical and legal effects of the agency action, and define the finality requirement in a pragmatic and flexible manner." *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1163 (9th Cir. 2018) (citations and internal quotations omitted).

The Corps argues that the Spellmon Memo "does nothing to fix a legal relationship or deny a right"; all it does is maintain the status quo. (Mot. at 20-21.) The Corps also claims that "[t]he practical effect of the Spellman [sic] Memo on the public and regulated community is nonexistent" in part because it simply defers agency decision-making. (*Id.*) The court has already rejected the Corps' deferral argument. *See supra* § III.B.1. In considering the Corps' other arguments, the court concludes that the Spellmon Memo determines "rights or obligations" and "legal consequences will flow" from it, thus satisfying *Bennett*'s second prong.

Far from maintaining the status quo, as the Corps alleges, the Spellmon Memo has indefinitely stopped any consideration of the Seattle District's § 404 boundary. Certainly this was not the case before the memo was published, considering that, in January 2016, the Seattle District convened the interagency workgroup to, *inter alia*, "review the current use of MHHW as the tidal datum used to determine the high tide line and alternatives thereto." (Workgroup Report at 7.) By halting this analysis, as well as determining that "elevations such as MAHT as they would be applied in Puget Sound are not consistent with the intent of the current definition of [high tide line]" (Spellmon Mem. at 1), the

//

Spellmon Memo has determined the rights and obligations of those with a legal stake in shoreline armoring projects in the Seattle District.

The cases the Corps relies on are distinguishable. For example, in *National Association of Home Builders v. Norton*, the D.C. Circuit determined that the agency's actions did not determine legal obligations because the agency's directives were "voluntary" and were "consistently referred to in agency documents as 'recommended,' rather than mandatory." 415 F.3d at 14 (citations omitted). The Spellmon Memo is anything but a recommendation: it "direct[s]" the Seattle District to stop considering its high tide line datum. (Spellmon Mem. at 1-2.)

Likewise, the EPA letter at issue in *Independent Equipment Dealers Association v. EPA* is dissimilar to the Spellmon Memo. 372 F.3d at 421-22. In that case, a private trade organization wrote to the EPA seeking its concurrence with the organization's interpretation of certain regulations. *Id.* at 421. The EPA replied, restating its long-held position that it did not agree with the organization's analysis. *Id.* The organization then initiated a lawsuit claiming that the EPA's letter improperly amended its regulations. *Id.* at 421-22. Focusing on whether the EPA letter met *Bennett*'s second prong, the D.C. Circuit explained that the letter "merely restated in an abstract setting—for the umpteenth time—EPA's longstanding interpretation of [certain] regulations." *Id.* at 427. According to the court, "[t]he Letter was purely informational in nature; it imposed no obligations and denied no relief. Compelling no one to do anything, the letter had no binding effect whatsoever—not on the agency and not on the regulated community." *Id.* It was, the

//

D.C. Circuit explained, "the type of workaday advice letter that agencies prepare countless times per year in dealing with the regulated community." *Id.*

The Spellmon Memo, however, was more than "informational in nature" and was not just a restatement "in an abstract setting." *Id.* Rather, it was a memorandum sent from the Commander of the Corps' Northwestern Division to a subordinate regional office, after evaluating new information from a group of experts, in direct response to an ongoing evaluation of high tide line datum. The Spellmon Memo also had a "binding effect" on the agency (*e.g.*, the Seattle District was prevented from further considering, let alone altering, its high tide line datum), as well as the regulated community (*e.g.*, it defined the § 404 parameters for shoreline armoring projects). Likewise, the Spellmon Memo is not "a workaday advice letter that agencies prepare countless times per year in dealing with the regulated community." *Id.* Unlike the letter in *Independent Equipment Dealers Association v. EPA*, the Spellmon Memo was not sent to a private party informing it of its CWA permitting obligations; rather, it was sent to the Seattle District, declaring the Corps' definitive position on the Seattle District's § 404 jurisdiction and directing the Seattle District to indefinitely stop its ongoing, years-long evaluation.

The discussion in *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, is instructive to the present case. *See* 136 S. Ct. at 1814-15. In *Hawkes*, the Supreme Court was asked to determine if a jurisdictional determination, or "JD," by the Corps, which states the agency's definitive view on whether a parcel of property contains "waters of the United States" under the CWA, is a reviewable final agency action. *Id.* at 1811. Regarding whether the JD gave rise to legal consequences, the Court discussed the effects of a

"negative JD," which is a determination that a property does not contain jurisdictional

waters. *Id.* at 1814. The Court explained that a negative JD binds the Corps and the EPA

to the position that the property does not contain jurisdictional waters. *Id.* Considering

that the Corps and EPA are the two agencies authorized to bring civil enforcement

proceedings under the CWA (which are more robust than citizen suits under the CWA), a

negative JD creates a "safe harbor" from civil enforcement proceedings for a property

owner. *Id.* (citing 33 U.S.C. § 1319 (provision on CWA permit enforcement)). Thus, the

Court explained, "a negative JD both narrows the field of potential plaintiffs and limits

the potential liability a landowner faces for discharging pollutants without a permit. Each

of those effects is a 'legal consequence[]' satisfying the second *Bennett* prong." *Id.*

(citations omitted).

Our case is similar to the negative JD discussed in *Hawkes*. The Spellmon Memo

has created a safe harbor for parties interested in shoreline armoring projects above

MHHW but below what Plaintiffs allege is the true high tide line. By exempting these

projects from § 404 permitting, the Spellmon Memo has narrowed the field of potential

plaintiffs and limited the potential liability for parties engaged in shoreline armoring.

Such consequences, the Supreme Court instructs, are legal consequences that satisfy the

second *Bennett* prong. *Id.*

The Corps asserts that a more appropriate vehicle for Plaintiffs' action is by

challenging an individual CWA permit that the Corps issues to a party engaged in

shoreline armoring. (Mot. at 20-21.) But this argument misses the point: Plaintiffs

contend that the Corps' current high tide line datum improperly exempts numerous

shoreline armoring projects from § 404 permitting, thus depriving Plaintiffs of the ability to enforce these permits through the CWA's citizen suit provisions. *See* 33 U.S.C. § 1365(a)(1). This is another way in which the Spellmon Memo has determined Plaintiffs' rights, as well as fixed Plaintiffs' legal relationship with both the Corps and parties engaged in shoreline armoring projects above MHHW but below the true high tide line.

The court takes seriously the Corps' contention that the Spellmon Memo does not satisfy *Bennett*'s second prong because it merely reiterates the Corps' longstanding position. But, as stated, agency decisions that do not "alter the legal regime" can still satisfy *Bennett*. *See Or. Natural Desert Ass'n*, 465 F.3d at 987. In addition, agency decisions to not act can still be reviewable final agency action. For example, in *City of Chicago v. United States*, the Supreme Court held that the Interstate Commerce Commission's ("ICC") decision to "dismiss[] a complaint on the merits and maintain[] the status quo is an exercise of administrative function, no more and no less, than an order directing some change in status." 396 U.S. 162, 166 (1969). In reaching this conclusion, the Court explained that "any distinction, as such, between 'negative' and 'affirmative' orders, as a touchstone of jurisdiction to review" an agency's actions "serves no useful purpose." *Id.* at 167.

The Corps argues that *City of Chicago* is distinguishable because the ICC was required by statute to make a decision on a complaint, regardless of whether the decision was to dismiss or act. (Reply at 9 (citing *City of Chi.*, 396 U.S. at 166).) According to the Corps, it was this statutory obligation that made the ICC's decision to dismiss a

complaint a "final agency action." *Id.* But this does not distinguish *City of Chicago* from our case. Here, the Corps is required by statute to regulate any discharge of dredged or fill materials into navigable waters that occur below the high tide line. *See* 33 U.S.C. § 1344; 33 C.F.R. § 328.4(b). As *City of Chicago* instructs, the Corps' decision to use MHHW instead of other datums to define its jurisdiction (as well as cut off all further consideration) is no less final simply because the Corps had used MHHW previously.

Lastly, as a corollary to its deferral argument, the Corps claims that the Spellmon Memo is not a final agency action because it "does not resolve the merits of the tidal datum issue." (Reply at 7, 9-11.) But it is hard to view the Spellmon Memo as anything but a decision on the merits. The Spellmon Memo states:

> I have reviewed the draft [Workgroup Report], including its discussion of the merits of utilizing Mean Annual Highest Tide (MAHT) as the CWA jurisdiction limit. I maintain that elevations such as MAHT as they would be applied in Puget Sound are not consistent with the intent of the current definition of [high tide line].

(Spellmon Mem. at 1.) By its terms, the Spellmon Memo explains that Major General Spellmon considered the "merits" of altering the Seattle District's high tide line jurisdiction. (*Id.*) Moreover, the court disagrees with the Corps' assertion that this statement was just "an aside" that reflected "only" Major General Spellmon's perspective. (Reply at 7.) This was the directive of the then-Commander of the Corps' Northwestern Division, issued to a subordinate regional office, ordering it to take certain actions and justifying those orders.

In sum, the court concludes that the Spellmon Memo marks the consummation of the Corps' decision-making process regarding the Seattle District's § 404 jurisdiction,

1   and that this action has determined rights and obligations and gives rise to direct and

2   appreciable legal consequences.  Accordingly, the court holds that the Spellmon Memo is

3   a final agency action reviewable under the APA.

4   **C.      Standing**

5         The Corps argues that, even if the Spellmon Memo is a final agency action, the

6   court should dismiss Plaintiffs' first cause of action because Plaintiffs lack standing to

7   challenge the action.  (Mot. at 3, 23-25.)  The court disagrees.

8         A plaintiff must demonstrate standing for each claim that he or she seeks to press

9   and for each form of relief sought.  *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352

10  (2006).  A plaintiff bears the burden of proof to establish standing "with the manner and

11  degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at

12  561.  "At the pleading stage, general factual allegations of injury resulting from the

13  defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general

14  allegations embrace those specific facts that are necessary to support the claim.'"  *Maya*

15  *v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561).

16        Where, as here, the plaintiffs are organizations, they may assert standing on behalf

17  of their members as long as the "members would otherwise have standing to sue in their

18  own right, the interests at stake are germane to the organization[s'] purpose, and neither

19  the claim asserted nor the relief requested requires the participation of individual

20  members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528

21  U.S. 167, 181 (2000); *see also Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th

22  Cir. 2013).  An individual has Article III standing to sue if (1) he or she suffered an injury

1  in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly

2  traceable to the challenged conduct; and (3) the injury is likely to be redressed by a

3  favorable court decision.  *Bellon*, 732 F.3d at 1139-40 (citing *Lujan*, 504 U.S. at 560-61).

4      At the outset, the court finds that Plaintiffs meet the last two criteria for

5  organizational standing, which the Corps does not challenge.  *See Friends of the Earth*,

6  528 U.S. at 181; (*see generally* Mot.)  Specifically, Plaintiffs are non-profit organizations

7  dedicated to the protection and restoration of the Puget Sound.  (Compl. ¶¶ 8-10.)

8  Plaintiffs' members assert health, recreational, environmental, aesthetic, and commercial

9  interests in the Puget Sound's shorelines and water bodies.  (*Id.* ¶ 11.)  These members

10  rely on Plaintiffs to represent their interests in protecting and restoring the Puget Sound's

11  shorelines and water bodies.  (*See id.* ¶¶ 8-11.)  Accordingly, the interests at stake in this

12  litigation are germane to Plaintiffs' purposes and the participation of individual members

13  in the lawsuit is not required.

14      Therefore, the crux of the standing inquiry is whether Plaintiffs' members would

15  otherwise have standing to sue in their own right.  At this stage, the court answers this

16  question in the affirmative.

17      "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that

18  they use the affected area and are persons for whom the aesthetic and recreational values

19  of the area will be lessened by the challenged activity."  *Friends of the Earth*, 528 U.S. at

20  183.  "[N]othing necessitates a showing of existing environmental harm."  *Ocean*

21  *Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 860 (9th Cir. 2005).  Rather,

22  "an increased risk of harm can itself be injury in fact for standing."  *Id.*; *Ecological*

*Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151-52 (9th Cir. 2000) ("'A plaintiff need not wait until his lake becomes barren and sterile or assumes an unpleasant color and smell before he can invoke the protections of the Clean Water Act.'") (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (internal punctuation omitted)). Therefore, an individual can establish "injury in fact" by "showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Ecological Rights Found.*, 230 F.3d at 1149.

Plaintiffs have pleaded that their members have "health, recreational, environmental, aesthetic, commercial, and/or other interests" in the shorelines and water bodies in Washington State. (Compl. ¶ 11.) Plaintiffs' allege that, from 2011 to 2015, on average, 3,483 feet of new shoreline armoring was added annually in the Puget Sound region. (*Id.* ¶ 28.) Moreover, Plaintiffs claim that the area between MHHW and MAHT "represents up to 8,600 acres of shoreline area in Washington state." (*Id.* ¶ 41.) Plaintiffs assert that shoreline armoring damages the Puget Sound ecosystem by disrupting species' spawning habitat and eliminating vegetation and finer-grained sediments. (*Id.* ¶¶ 29, 31-33.) These impacts are felt throughout the food chain, affecting forage fish and aquatic plants as well as endangered salmon and orcas. (*Id.* ¶ 31, 34.) Plaintiffs also contend that shoreline armoring is one of the main impediments to restoring the Puget Sound habitat. (*Id.* ¶ 30.) In addition, Plaintiffs allege that "armoring causes not only

localized shoreline impacts, but also system-scale, cumulative harm to plants and animals that depend on the nearshore ecosystem." (*Id.* ¶ 34.) Lastly, Plaintiffs claim that, because MHHW is below the true high tide line, "the majority of shoreline armoring projects in the Puget Sound region do not fall within the Seattle District's unlawfully narrow definition of its tidal jurisdiction." (*Id.* ¶ 42.)

The Corps argues that Plaintiffs' pleadings do not establish an injury in fact because Plaintiffs do not challenge a "concrete application of the Spellmon Memo and use of [MHHW] . . . at a particular property in which Plaintiffs can demonstrate a legally cognizable interests, such as might occur in a final Corps Section 404 permit decision." (Mot. at 25.) At the motion to dismiss stage, however, courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Maya*, 658 F.3d at 1068. Thus, at this stage, it is enough that Plaintiffs have articulated their legally cognizable interests in the shoreline and waters of the Puget Sound region, the alleged harms to those interests caused by shoreline armoring, the amount of shoreline armoring occurring each year, and that the majority of shoreline projects are built in the area above MHHW but below the true high tide line. On these allegations, the court finds that Plaintiffs have sufficiently alleged an injury in fact.

The "fairly traceable" and "redressability" components for standing overlap and are "two facets of a single causation requirement." *Bellon*, 732 F.3d at 1146 (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). "The two are distinct insofar as causality examines the connection between the alleged misconduct and injury, whereas

//

redressability analyzes the connection between the alleged injury and requested judicial relief." *Id.*

To satisfy the causality element at the motion to dismiss stage, "plaintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Maya*, 658 F.3d at 1070 (quoting *Allen*, 468 U.S. at 757). A "causal chain does not fail simply because it has several 'links,' provided those links are not hypothetical or tenuous and remain plausible." *Id.* (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)) (internal punctuation omitted). Plaintiffs must show that their injury is causally linked or "fairly traceable" to the Corps' alleged misconduct, and not the result of misconduct of some third party not before the court. *Bellon*, 732 F.3d at 1146 (citing *Lujan*, 504 U.S. at 560-61). However, Plaintiffs need not show that the Corps is the "sole source" of its members' injuries, and "need not eliminate any other contributing causes to establish its standing." *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011).

A plaintiff meets the redressability requirement if it is likely, even if not necessarily certain, that his injury can be redressed by a favorable decision. *See Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir. 2004); *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994) (stating that a plaintiff "must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury").

Plaintiffs have sufficiently pleaded these two requirements. Plaintiffs' members' alleged injuries are causally linked and fairly traceable to the Corps' decision to define its

§ 404 jurisdiction by MHHW datum.  Again, Plaintiffs claim that, because MHHW is below the true high tide line, "the majority of shoreline armoring projects in the Puget Sound region do not fall within the Seattle District's unlawfully narrow definition of its tidal jurisdiction."  (Compl. ¶ 42.)  Plaintiffs say that the Corps acknowledged as much in a 2014 report, stating that using MHHW "contribut[es] to the minimal amount of federal permitting in the Puget Sound region for armoring projects."  (*Id.*)  Although the Corps may not be the "sole source" of the members' alleged injuries insofar as the improperly unpermitted shoreline armoring projects themselves contribute, the Corps' decision to not extend § 404 permitting to these projects is in the "line of causation."  *Maya*, 658 F.3d at 1070.  In this light, a favorable ruling that requires the Corps to exercise its lawful § 404 jurisdiction would redress Plaintiffs' members' alleged injuries.

## IV.    CONCLUSION

For the foregoing reasons, the court DENIES the Corps' motion to dismiss.  (Dkt. # 13.)

Dated this 5th day of February, 2019.

JAMES L. ROBART
United States District Judge